# EXHIBIT A

Approved, SCAO

Original - Court
1st copy - Defendant

2nd copy - Plaintiff
3rd copy - Return

| STATE OF MICHIGAN JUDICIAL DISTRICT 30th JUDICIAL CIRCUIT COUNTY PROBATE | SUMMONS AND COMPLAINT | CASE NO. 16 - 115 -CB |
|---|---|---|

Court telephone no. (517) 483-6500

JUDGE JAMES S. JAMO

Court address
313 W. Kalamazoo Street, Lansing, MI 48933

| Plaintiff's name(s), address(es), and telephone no(s). | v | Defendant's name(s), address(es), and telephone no(s). |
|---|---|---|
| Protecting Michigan Taxpayers | | Timothy F. Mooney 746 E. Winchester St. Ste 140 Salt Lake City, Utah 84107<br>Chuck Warren 746 E. Winchester St. Ste 140 Salt Lake City Utah 84107 |
| Plaintiff's attorney, bar no., address, and telephone no.<br>Norman C. Witte (P40546)<br>Witte Law Offices, PLLC<br>119 E. Kalamazoo Street<br>Lansing, MI 48933<br>517-485-0070 | | DATE: 2/29/2016<br>TIME: 1:30 pm<br>WHO: Chuck Warren<br>BY: [signature]<br>LIC#: A103985<br>ICU Investigations 435-986-1200<br>473 E River Rd #1-275, St George UT 84790 |

**SUMMONS** **NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state). (MCR 2.111[C])
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued | This summons expires | Court clerk |
|---|---|---|
| FEB 8 2016 | MAY 9 2016 | FARA DUFFEY |

*This summons is invalid unless served on or before its expiration date.
This document must be sealed by the seal of the court.

**COMPLAINT** ***Instruction: The following is information that is required to be in the caption of every complaint and is to be completed by the plaintiff. Actual allegations and the claim for relief must be stated on additional complaint pages and attached to this form.***

**Family Division Cases**

☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.

☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in ______________ Court.

The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**General Civil Cases**

☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in ______________ Court.

The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**VENUE**

| Plaintiff(s) residence (include city, township, or village) | Defendant(s) residence (include city, township, or village) |
|---|---|
| Okemos | Salt Lake City |
| Place where action arose or business conducted<br>Ingham County | |

02/08/2016
Date

Signature of attorney/plaintiff Norman C. Witte (P40546)

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

Norman C. Witte Law Office · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070 · Facsimile (517) 485-0187

# STATE OF MICHIGAN
# IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

## 30TH CIRCUIT

**Protecting Michigan Taxpayers**, a Michigan non-profit corporation,

Plaintiff,

v.

**Timothy F. Mooney** and **Chuck Warren**, both d/b/a **Silver Bullet, LLC**

Defendants.

Docket No. 16-115-CB
Hon. Joyce A. Draganchuk

JUDGE JAMES S. JAMO

Norman C. Witte (P40546)
WITTE LAW OFFICES, PLLC
Attorneys for Plaintiff
119 E. Kalamazoo Street
Lansing, Michigan 48933-2111
(517) 485-0070
Facsimile (517) 485-0187
ncwitte@wittelaw.com

*There is no other pending or resolved civil action arising out of the transaction or occurrence alleged in the complaint.*

**Verification under MCR 2.112(O)(1):** Protecting Michigan Taxpayers, through its counsel, verifies that the claims alleged in this Complaint involve a business or commercial dispute as defined in MCL 600.8031.

Norman C. Witte (P40546)

## COMPLAINT

Protecting Michigan Taxpayers ("PMT"), through its attorneys, Witte Law Offices, PLLC, states its Complaint as follows:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff PMT is a Michigan non-profit corporation with its principal offices located in Ingham County, Michigan. Its registered office is located in Ingham County at 2145 Commons Parkway, Okemos, Michigan 48864.

2. Defendant Timothy F. Mooney ("Mooney") is an individual whom PMT is informed and believes resides at 38060 N. Miramonte Drive, Cave Creek, Arizona 85331-8548.

3. Mr. Mooney does business at 746 E. Winchester Street, Suite 140, Salt Lake City, Utah 84107.

4. Defendant Chuck Warren ("Warren") is an individual whom PMT is informed and believes does business at 746 E. Winchester Street, Suite 140, Salt Lake City, Utah 84107.

5. PMT is informed and believes that Mr. Mooney and Mr. Warren do business as a *de facto* partnership under the name "Silver Bullet LLC" ("Silver Bullet").

6. Mr. Mooney and Mr. Warren acting as Silver Bullet are a business enterprise as defined in MCL 600.8031(b).

7. This is a commercial dispute between business entities under MCL 600.8031, and the amount in controversy exceeds $25,000 exclusive of costs and interest.

8. The Circuit Court has jurisdiction under MCL 600.8035.

9. Venue is proper in this Court pursuant to MCL 600.1621(b) and MCL 600.1627.

## GENERAL ALLEGATIONS

### THE AGREEMENT AND CIRCULATION OF PETITIONS

10. In 2015, PMT began taking steps under MCL 168.471 *et seq.* to pursue a initiative aimed at repealing Michigan's prevailing wage law (the "Initiative").

Norman C. Witte Law Office · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070 · Facsimile (517) 485-0187

Norman C. Witte Law Office · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070 · Facsimile (517) 485-0187

11. Under Const 1963, Art II, § 9, in order to place the Initiative before the Legislature, PMT was required to submit "petitions signed by a number of registered electors, not less than eight percent for initiative…of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected."

12. In 2015, the number of signatures required for PMT to have the Initiative placed before the Legislature was 252,523.

13. Pursuant to MCL 168.472a, all of the signatures necessary for the Initiative had to be gathered within the 180 days immediately preceding the submission of the signatures to the Michigan Department of State.

14. Mr. Mooney and Mr. Warren, acting as Silver Bullet, hold themselves out as having expertise in the business of circulating petitions for initiatives such as that being sponsored by PMT.

15. On January 10, 2015, Mr. Mooney, nominally on behalf of Silver Bullet submitted a proposal to Chris Fisher, president of ABC of Michigan to provide petition circulation services. A copy of that proposal is attached as **Exhibit A**.

16. The proposal set forth "Silver Bullet's" qualifications to conduct a petition drive in Michigan. Specifically, it stated as follows:

> **<u>Our Michigan specific work includes</u>**:
>
> - Gathering over 1.2 million signatures in 65 days to simultaneously qualify two initiatives in Michigan.
> - Qualifying numerous candidates for the Michigan ballot in incredibly tight timeframes for offices from Congress to the presidency.

*Id.* at 1.

17. By making these statements Mr. Mooney held himself and Mr. Warren out as having expertise and specialized knowledge in the process of conducting petition drives in the state of Michigan.

18. In the proposal, Mr. Mooney made further references to "Michigan rules and challenges," further implying that he and his organization had specialized knowledge regarding the petition process in Michigan.

19. In the "Recommendations" section of the proposal, Mr. Mooney clearly stated that his organization guaranteed at least a 70% validity rate:

> At a 70% validity rate, the minimum number of signatures necessary to garner the bare minimum of 252,522 would be 360,746. We strongly would recommend gathering a minimum of 375,000 – a cushion of 32.66%, and possible a total of 400,000 signatures – a cushion of 36.87%.
>
> Let us be clear, while we will guarantee a 70% validity, we believe the cost of legal fees and critical time will far outweigh the cost of gathering sufficient signature [*sic*] to better dissuade potentially protracted litigation.

*Id.* at 2.

20. Mr. Mooney understood exactly what was at stake if his organization was hired to circulate petitions and they missed the mark. In the "Why Silver Bullet" section of the proposal, he wrote: "As we tell clients all the time – *"Successful initiative petitions are very expensive…except compared to the unsuccessful ones. Those are a lot more costly."* *Id.* at 3 (emphasis in original).

21. These words turned out to be prophetic.

22. In 2015, the following representation appeared on the Silver Bullet website, www.silverbulletllc.com:

> 1.2 MILLION SIGNATURES GATHERED IN MICHIGAN IN 60 DAYS
>
> Silver Bullet was able to gather over 1.2 million signatures total, from all 83 counties in Michigan in 60 days placing two issues on the ballot for November 2012. The first issue was "The People Should Decide" Initiative, which allowed the people of Michigan to

Norman C. Witte Law Office · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070 · Facsimile (517) 485-0187

Norman C. Witte Law Office · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070 · Facsimile (517) 485-0187

vote on whether they wanted to build a new international toll bridge, costing the tax-payers of Michigan hundreds of millions of dollars. Silver Bullet was able to gather 609,220 signatures. The second issue was the "Michigan Alliance for Prosperity" initiative that requires any new taxes must pass with a two thirds majority – eliminating or greatly reducing the possibility of a fully partisan tax hike. 613,379 total signatures were gathered.

23. Silver Bullet's website also contained the following claims:

SILVER BULLET IS WORKING TO CLEAN UP THE PETITION BUSINESS.

Let's face it, other firms have been sloppy, have cut corners, and sometimes have flat-out failed to follow the law. That's why Silver Bullet has a specific Code of Conduct. Every petitioner signs this Code of Conduct prior to gathering signatures. Further, Silver Bullet publishes a firm "Do-Not-Hire" list. Petitioners whose work isn't up to our standards or who have violated our Code of Conduct will never work for us, or any of our vendors, ever again. And lastly, if we hear of any petitioner violating any part of election law, we'll encourage law enforcement to prosecut;, [*sic*] we'll cooperate with any investigation, and if permitted we'll testify for the prosecution. Successful petition drives can seem expensive…except when compared to unsuccessful petition drives. Unsuccessful drives not only lose the money spent gathering signatures, but also suffer the loss of opportunity for action and the loss of credibility with donors. Silver Bullet will make your drive successful.

24. The import of this statement is that Silver Bullet asserts that it is capable of competently gathering signatures for initiative petitions in Michigan.

25. In order to further induce PMT to retain Silver Bullet, Silver Bullet supplied PMT with a copy of its "Code of Conduct," the pertinent provisions state in part:

CODE OF ETHICS AND STANDARDS OF PRACTICE
FOR SILVER BULLET LLC

As an independent consultant, sub-contractor, supervisor, coordinator or signature gatherer for Silver Bullet, I agree to certain standards of practice that I must maintain. I pledge to adhere to the following Code of Professional Ethics when employed or contracted by Silver Bullet:

. . .

- I will fully abide by all local, state and federal laws regarding the gathering of signatures for initiative, referendum, recall and voter registration.

. . .

> I finally understand that if Silver Bullet becomes aware of my violating any part of election law, Silver Bullet will encourage law enforcement to prosecute, will cooperate with any investigation, and if permitted will testify for the prosecution.

A copy of Silver Bullet's Code of Conduct is attached as **Exhibit B.**

26. Silver Bullet's Code of Conduct was a material consideration for PMT, as it was of paramount importance to PMT that the petition drive be conducted in an ethical and accurate manner.

27. On May 28, 2015, Silver Bullet entered into a contract (the "Agreement") with PMT to provide professional petition circulation services, a copy of which is attached as **Exhibit C.**

28. The Agreement stated that Silver Bullet would obtain not less than 365,000 and not more than 385,000 signatures for the Initiative with at *minimum* a 70% validity rate. Exhibit C, Recitals, ¶ 3.

29. Article 3, Section 3.01(c) of the Agreement provided that Silver Bullet would validate 100% of the signatures gathered based upon written criterion provided by PMT. *Id.*

30. Among the written materials provided by PMT was an email dated May 21, 2015 from PMT's vice-president Chris Fisher ("Fisher") to Silver Bullet in which Mr. Fisher provided Silver Bullet with a hyperlink to information published by the Michigan Department of State regarding initiative and referendum petitions. The email and referenced document are attached collectively as **Exhibit D.**

31. Page 8 of the Michigan Department of State document provided by Mr. Fisher to Silver Bullet states in bold type as follows:

> **WARNING -A person who knowingly signs this petition more than once, signs a name other than his or her own, signs when not a qualified and registered elector, or sets opposite his or her signature on a petition, a date other than the actual date the signature was affixed, is violating the provisions of the Michigan election law.**

32. On or about June 1, 2015, Mr. Fisher provided Mr. Mooney with petitions to be circulated by Silver Bullet. On <u>each</u> petition, the following warning unambiguously appears:



Norman C. Witte Law Office · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070 · Facsimile (517) 485-0187

> WARNING -A person who knowingly signs this petition more than once, signs a name other than his or her own, signs when not a qualified and registered elector, or sets opposite his or her signature on a petition, a date other than the actual date the signature was affixed, is violating the provisions of the Michigan election law.

A copy of the Petition is attached as **Exhibit E.**

33. On June 1, 2015, Mr. Fisher provided Silver Bullet with written circulation instructions (the "Circulation Instructions"). The email and instructions are attached collectively as **Exhibit F.**

34. The Circulation Instructions provided by PMT included a bullet point stating, "Signers may only sign ONE petition." (Emphasis in original.) *Id.*

35. Silver Bullet unambiguously confirmed its understanding of this requirement on June 3, 2015, when it emailed copies of the Circulation Instructions and other documents to PMT's counsel, Eric Doster ("Doster"), for approval. That email and the attachments are attached collectively as **Exhibit G.**

36. Under Section 3.02 of the Agreement, Silver Bullet was to "determine the method, details and means of performing its services under this Agreement." *See* Exhibit C.

37. Section 3.08 of the Agreement provided that Silver Bullet was required to "perform its services hereunder without violation of campaign or election laws." *See* Exhibit C.

38. Section 6.01(A) required Silver Bullet to make its best efforts to collect 375,000 gross signatures with a 70% validity rate. *See* Exhibit C.

39. Section 7.05 of the Agreement provides, "Time is of the essence of this Agreement and all provisions hereof." *See* Exhibit C.

Norman C. Witte Law Offices · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070 · facsimile (517) 485-0187

40. On June 1, 2015, Mr. Mooney emailed Mr. Fisher stating: "I'll be meeting with the Elections Division today to ensure we're the "A" students when it comes to this petition - we want to be the cleanest, easiest petition they have to deal with."

41. In June 2015, Silver Bullet began circulating petitions as provided in the Agreement.

42. When conducting a petition drive, it is important to collect a number of signatures which far exceeds the minimum number required. This is because petition signatures may be invalidated due to items such as inserting a wrong date or an unregistered voter mistakenly signing the petition.

43. In the present case, since a minimum of 252,523 valid signatures was required, PMT needed to submit to the Michigan Department of State a number of petition signatures far in excess of 252,523, the minimum required number.

44. The Michigan Election Law requires a petition sponsor to file all of its petition signatures at one time as supplemental filings are prohibited. *See* MCL 168.475(2).

45. Therefore, PMT had only one opportunity to submit petition signatures and needed to submit to the Michigan Department of State a number of signatures far in excess of 252,523, the minimum required number.

46. In order to get a better sense of the number of valid signatures contained in the petition drive being conducted by Silver Bullet, the Agreement required Silver Bullet to validate the petitions. *See* Exhibit C, Article 3, Section 3.01(c).

47. As required by the Agreement, PMT paid Silver Bullet $0.35 per signature for validation of signatures in addition to the per-signature collection fee. *See* Article 3, Section 4.01(b)5 of Exhibit C.

Norman C. Witte Law Office · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070 · Facsimile (517) 485-0187

48. PMT learned after the petitions were submitted that Silver Bullet sub-contracted with JMS & Associates, Inc. ("JMS") to provide validation services required of Silver Bullet under the Agreement.

49. PMT is informed and believes that JMS provided detailed reports to Silver Bullet regarding the number of signatures that were obtained, the number that were invalid, and the remaining number of valid signatures.

50. At no time prior to the time that PMT submitted petition signatures to the Michigan Department of State did Silver Bullet ever show its validation reports from JMS (which PMT paid for) to PMT.

51. On September 14, 2015, Silver Bullet provided PMT a tally of signatures collected, indicating that 390,861 signatures were being turned in, and that 10,007 had been "black-striped," *i.e.*, lined-out because they were invalid. A copy of the tally is attached as **Exhibit H.**

52. Silver Bullet clearly understood that invalid signatures had to be deleted, as evidenced by the fact that over 10,000 signatures were black-striped.

53. The same day, PMT acted on Silver Bullet's recommendation and submitted the petitions circulated by Silver Bullet to the Michigan Department of State.

54. Because PMT relied on Silver Bullet's guarantee of a 70% validity rate, turning in an excess of 390,000 petition signatures shall have been more than an adequate amount of petition signatures to obtain approval by the Michigan Department of State.

55. At the time that the petitions were submitted, approximately 100 days had passed since collection efforts had begun, and thus PMT could have collected signatures for nearly three more months had it been necessary to do so.

Norman C. Witte Law Office · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070 · Facsimile (517) 485-0187

56. A report was prepared by the Bureau of Elections staff regarding the petitions circulated by Silver Bullet. A copy of that report, dated November 2, 2015, is attached as **Exhibit I**.

57. As detailed in that report, it was estimated that 229,629 valid signatures were submitted, 22,894 fewer than the minimum required.

58. This determination was made based upon examination of a sample of 509 signatures. Of these signatures, 104 were invalid due to the signer's registration status; 27 were facially defective based upon dual jurisdiction entry, improper jurisdiction entry, date error or address error; ten were invalid due to signature errors; four were invalid due to errors made by the circulator in completing the petition form; and 63 were invalid because they were duplicate signatures.

59. In validating the signatures, Silver Bullet failed to black-stripe an inordinate number of duplicate signatures, with the result that both the duplicates and the first signature for each such individual was disregarded.

60. On November 5, 2015, Michigan Elections Director Christopher Thomas made a verbal report to the Board of State Canvassers regarding this petition drive. An informal transcript of his comments is attached as **Exhibit J**. Mr. Thomas stated as follows:

> The result of finding an insufficient number of valid petition entries is disturbing. The proportion of valid signatures in the Prevailing Wage Petition is 59.1%. There is no other petition since random sampling began in 1978 that has a proportion valid in 50 percentiles, or, with one exception, even the 60 percentiles. This petition is clearly an outlier.
>
> Petition circulators have clear statutory duties, two of which are: that he or she has neither caused nor permitted a person to sign the petition more than once and has no knowledge of a person signing the petition more than once and the person signing the petition was at the time of signing a registered elector. The Petition Gathering Company clearly failed to put circulators in the field who complied with these instructions. Consider their performance: 20% of the sampled entries were made by persons not registered to vote; at least 15% of the sampled entries were duplicates. <u>The crowning blow is that 40 of the sampled entries were gathered by circulators who signed the petition more than once.</u> (emphasis added)



Norman C. Witte Law Office · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070 · Facsimile (517) 485-0187

61. As outlined by Mr. Thomas, Silver Bullet clearly failed to follow its own "Code of Conduct."

62. Specifically, Mr. Thomas identified as the "crowning blow" the egregious conduct of numerous circulators hired by Silver Bullet who *themselves* signed the petitions as an elector more than once, a blatant violation of Michigan law.

63. Upon information and belief, the validation reports prepared by JMS (which PMT paid for) set forth the names of the duplicate petition signers.

64. Therefore, since Mr. Mooney had access to the JMS validation reports, Mr. Mooney knew that Silver Bullet's own circulators were signing the petition multiple times, but concealed this information from PMT.

65. According to the Michigan Department of State, the validity rate of the petition drive conducted by Silver Bullet was 59.1%. *See* Exhibit J.

66. According to the Michigan Department of State, *no petition consulting firm has submitted a lower percentage of valid petition signatures than Silver Bullet supplied in the present case since records have been kept! See* Analysis of Validity Rates for Initiative and Referendum Petitions 1978 – 2014, dated March 2015 from the Michigan Department of State and attached as **Exhibit K**.

67. Had PMT been aware, prior to submitting its petitions to the Michigan Department of State on September 14, 2015, that Silver Bullet had conducted the worst petition drive in the history of the State of Michigan, PMT certainly had the time and financial resources to collect more petition signatures.

68. Despite its representation in its "Code of Conduct" (*see* Exhibit B and Silver Bullet website) that it would "encourage law enforcement to prosecut;, [*sic*]" any of its circulators who

Norman C. Witte Law Office · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070 · Facsimile (517) 485-0187

violated election law, PMT is informed and believes that Silver Bullet has yet to press charges against any of its circulators.

69. Because Silver Bullet conducted the worst petition drive in the history of the State of Michigan, PMT failed to submit sufficient signatures for the Initiative to be placed before the Legislature; therefore, PMT was forced to withdraw the petition.

70. Over the life of the Agreement, PMT paid Silver Bullet $1,356,397.55.

71. As a result of Silver Bullet's failure to provide sufficient signatures, the entire value of PMT's investment was lost, and PMT was unable to proceed with the initiative.

72. Section 5.04 of the Agreement requires Silver Bullet to reimburse PMT for losses incurred by PMT as a result of Silver Bullet's negligence, misconduct, or material breach of the Agreement.

73. In addition to the amounts paid to Silver Bullet, at least an additional $500,000 was spent in connection with the campaign.

74. A substantial portion of this investment in legal fees, printing costs, administrative costs and other out-of-pocket expenses will have to be duplicated as part of a new petition drive.

## Issues Surrounding the Purported Existence of Silver Bullet LLC

75. The first paragraph of the Agreement, Exhibit C, states that Silver Bullet LLC is a "Nevada corporation".

76. Nevada law provides that the designation "LLC" is to be used for a limited liability company, not a corporation. *See* NRS 86.171.

77. The January 10, 2015 proposal authored by Mr. Mooney described him as a "Partner" of "Silver Bullet LLC." *See* Exhibit A.

Norman C. Witte Law Offices · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070 · Facsimile (517) 485-0187

Norman C. Witte Law Office · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070 · Facsimile (517) 485-0187

78. The signature block of the Agreement, Exhibit C, indicates that it is being signed by Mr. Mooney, in his capacity as "Partner" of "Silver Bullet LLC".

79. The signature block shows the address of Silver Bullet LLC as 746 East Winchester Street, Suite 140, Salt Lake City, Utah 84107.

80. A search of Nevada's corporate records reveals that no entity named "Silver Bullet LLC" is registered in the state. *See* screen print of search attached as **Exhibit L**.

81. There are three entities listed in the search that could be related to "Silver Bullet LLC."

82. The first such entity is SilverBullet Group, Inc. A copy of the search results for that entity is attached as **Exhibit M**.

83. Exhibit M shows that the officers of SilverBullet Group, Inc. are Messrs. Mooney and Warren.

84. As demonstrated by Exhibit M, SilverBullet Group, Inc. is a corporation, not a limited liability company.

85. Exhibit M also shows that SilverBullet Group, Inc. is in default and that its business license expired June 30, 2015.

86. The second possibly related entity is Silverbullet Communications, LLC. A copy of the search results for that entity is attached as **Exhibit N**.

87. Exhibit N shows that Mr. Warren is the managing member of Silverbullet Communications, LLC.

88. Exhibit N shows that Silverbullet Communications, LLC was dissolved on November 30, 2015.

89. The last possibly related entity is Silver Bullet Group I, LLC. A copy of the search results for that entity is attached as **Exhibit O.**

90. Exhibit O does not identify any officers for Silver Bullet Group I, LLC.

91. Exhibit O shows that Silver Bullet Group I, LLC was formed on December 15, 2015, approximately two weeks after Silverbullet Communications, LLC was dissolved.

92. Each of the three entities identified above have designated their registered agent as Nevada Corporate Headquarters, Inc., with its address at 4730 S. Fort Apache Road, Suite 300, Las Vegas, Nevada 89147.

93. PMT's payments under the Agreement were made by wire transfer to "Silver Bullet Group, LLC." *See* exemplar wire transfer request attached as **Exhibit P.**

94. The invoice attached as part of Exhibit P indicates the name "Silver Bullet LLC" in large print.

95. In the "Bill From" section, the invoice indicates that the billing party is "Silver Bullet, Inc.

96. The wire transfer instructions indicate that the payment is to be wired to "Silver Bullet Group, Inc."

97. None of the Silver Bullet entities mentioned in the preceding paragraphs have qualified to do business in Utah.

98. None of the Silver Bullet entities mentioned in the preceding paragraphs have qualified to do business in Michigan as required by Michigan law.

99. Mr. Warren describes his position with Silver Bullet as "managing director" on Silver Bullet's "About Us" webpage, attached as **Exhibit Q.**

Norman C. Witte Law Offices · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070 · Facsimile (517) 485-0187

Norman C. Witte Law Office · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070 · Facsimile (517) 485-0187

100. Mr. Mooney describes his position with Silver Bullet as "founding partner" on Silver Bullet's "About Us" webpage. *See* Exhibit R.

101. Messrs. Warren and Mooney's biographies both appear under the heading, "Managing Partners." *See* Exhibit R.

102. Nevada law provides that a limited liability company is managed either by members or a manager, not a "partner." *See* NRS 86.291.

103. No corporation or limited liability company exists that is registered to do business in Nevada having the name "Silver Bullet LLC".

104. Messrs. Warren and Mooney held themselves out as partners in the business enterprise referred to as "Silver Bullet LLC."

## COUNT I

## BREACH OF CONTRACT – MESSRS. WARREN AND MOONEY

105. All previous paragraphs are realleged as though fully restated.

106. Messrs. Warren and Mooney, doing business as Silver Bullet, entered into a contract with PMT to provide petition circulation services.

107. Messrs. Warren and Mooney breached their contract by, for example:

a. Failing to obtain at least 365,000 signatures with at least a 70% validity rate;

b. Failing to properly validate 100% of the signatures based upon the written instructions provided by PMT;

c. Failing to exercise best efforts to collect 375,000 signatures with a 70% validity rate;

d. Failing to inform PMT of the true facts regarding the number of invalid signatures prior to advising PMT to submit the signatures to the Michigan Department of State;

e. Failing to inform PMT that Silver Bullet's own circulators were signing the petition multiple times; and

f. Failing to black stripe invalid signatures as required under Michigan law to preserve at least one signature for names that were duplicated.

108. Messrs. Warren and Mooney's breach of the Agreement was material.

109. As a direct result of Messrs. Warren and Mooney's breach of the Agreement, PMT has incurred damages of at least $1,356,397.55, the amount it paid to Messrs. Warren and Mooney.

110. In addition, PMT has experienced additional consequential damages associated with the abortive petition drive, and will incur additional damages in the form of costs of cover.

111. All conditions precedent under the Agreement have been performed or have occurred.

WHEREFORE, PMT requests that this Honorable Court enter a judgment for PMT and against Messrs. Warren and Mooney, jointly and severally, in an amount in excess of $1,356,397.55, plus statutory interest, court costs and attorney fees as may be allowed by law.

## COUNT II

## UNJUST ENRICHMENT – MESSRS. WARREN AND MOONEY

112. All previous paragraphs are realleged as though fully restated.

113. The payments made to Messrs. Warren and Mooney, doing business as Silver Bullet, constituted a benefit from PMT to them.

114. Messrs. Warren and Mooney acted inequitably by, for example:

Norman C. Witte Law Office · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070 · Facsimile (517) 485-0187

a. Holding itself out as having expertise under Michigan law when it clearly did not have such expertise, as demonstrated by having the worst result for a initiative drive since the Michigan Department of State began keeping records;

b. Failing to provide accurate information regarding validation of signatures to PMT;

c. Failing to follow its own Code of Conduct with respect to training circulators; and

d. Failing to follow its own Code of Conduct with respect to prosecuting violations of election law.

115. Messrs. Warren and Mooney were unjustly enriched by the payments they received from PMT.

116. Under the facts set forth above, it would be inequitable for Messrs. Warren and Mooney to retain the benefit of the payments they received from PMT.

WHEREFORE, PMT requests that this Honorable Court enter a judgment for PMT and against Messrs. Warren and Mooney, jointly and severally, in an amount in excess of $1,356,397.55, plus statutory interest, court costs and attorney fees as may be allowed by law.

## COUNT III

## *QUANTUM MERUIT* – MESSRS. WARREN AND MOONEY

117. All previous paragraphs are realleged as though fully restated.

118. The payments made to Messrs. Warren and Mooney, doing business as Silver Bullet, constituted a benefit from PMT to them.

119. Messrs. Warren and Mooney acted inequitably by, for example:

Norman C. Witte Law Office · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070 · Facsimile (517) 485-0187

a. Holding itself out as having expertise under Michigan law when it clearly did not have such expertise, as demonstrated by having the worst result for a petition drive since the Michigan Department of State began keeping records;

b. Failing to provide accurate information regarding validation of signatures to PMT;

c. Failing to follow its own Code of Conduct with respect to training circulators; and

d. Failing to follow its own Code of Conduct with respect to prosecuting violations of election law.

120. To the extent that there was no contract because Silver Bullet was a non-existent entity, the payments made to Messrs. Warren and Mooney, doing business as Silver Bullet, constitute an independent benefit they unjustly received from PMT.

WHEREFORE, PMT requests that this Honorable Court enter a judgment for PMT and against Messrs. Warren and Mooney, jointly and severally, in an amount in excess of $1,356,397.55, plus statutory interest, court costs and attorney fees as may be allowed by law.

## COUNT IV

## FRAUD – MR. MOONEY

121. All previous paragraphs are realleged as though fully restated.

122. Prior to advising PMT to submit the petitions to the Michigan Department of State, Mr. Mooney was receiving validation reports from JMS.

123. Based upon the validation reports, Mr. Mooney was aware that the petitions received had an excessive number of duplicate signatures, and that Silver Bullet's own circulators themselves were unlawfully signing the petition multiple times.



Norman C. Witte Law Office · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070 · Facsimile (517) 485-0187

124. Based upon the information provided to Mr. Mooney, PMT is informed and believes that he knew that the duplicate signature issue would bring the validity rate to significantly less than 70%.

125. The Michigan Department of State ultimately determined the validity rate to be 59.1%.

126. PMT relied on Mr. Mooney's representation that the validity rate would be not less than 70% by not requiring that additional signatures be gathered.

127. As a result of PMT's reliance on Mr. Mooney's misrepresentation, PMT's petition drive failed, and the Initiative was not placed before the Legislature.

128. As a result of Mr. Mooney's misrepresentation, PMT has been damaged in an amount in excess of $1,356,397.55.

WHEREFORE, PMT requests that this Honorable Court enter a judgment for PMT and against Mr. Mooney in an amount in excess of $1,356,397.55, plus statutory interest, court costs and attorney fees as may be allowed by law.

Respectfully submitted,

PROTECTING MICHIGAN TAXPAYERS

Dated: February 8, 2016

Norman C. Witte (P40546)
WITTE LAW OFFICES
Attorneys for Protecting Michigan Taxpayers
119 E. Kalamazoo Street
Lansing, Michigan 48933-2111
(517) 485-0070
Facsimile (517) 485-0187
ncwitte@wittelaw.com



Norman C. Witte Law Office · 119 E. Kalamazoo Street · Lansing, Michigan 48933-2111 · (517) 485-0070 · Facsimile (517) 485-0187

A

SILVER BULLET
4730 South Fort Apache Road, Suite 300
Las Vegas, Nevada 89147-7947 - 702.496.7167
746 East Winchester Street, Suite 140
Salt Lake City, Utah 84107 - 801.685.2767
8701 East Pinnacle Peak Road, C-204 PMB-308
Scottsdale, Arizona 85255 - 480.518.6168
www.SilverBulletLLC.com

TO: Chris Fisher / President
ABC of Michigan

FROM: Tim Mooney / Partner
Silver Bullet LLC

RE: Potential Florida Statewide Initiative

DATE: January 10, 2015

---

Thank you for considering Silver Bullet for the potential Michigan initiative campaign. As you may know, the partners of Silver Bullet each have some three decades of experience qualifying and winning ballot measures across the country, as well as work in many other areas of politics.

<u>Some of our national "greatest hits" highlights include</u>:

- Winning 32 of 36 ballot measures across the country, where Silver Bullet was the General Consultant, or among the lead consulting team, including amending State Constitutions 14 times in 8 states.
- Managing the Republican National Committee's unprecedented ground game for the 2014 general election in 6 states, leading to US Senate victories in 5 of the 6 states.
- Gathering over 2.8 million signatures in 49 days to simultaneously qualify 4 separate referendums in California.
- Gathering more than 114,000 signatures for the Miami-Dade recall election in just two weeks – the second biggest recall in US History.
- Winning the Miami-Dade recall election with 89% of the vote – the biggest margin of victory of any recall in US history.
- Gathering over 145,000 signatures in Oregon in 43 days, setting the record for quickest qualified initiative in state history, with the highest validity rate ever.

<u>Our Michigan specific work includes</u>:

- Gathering over 1.2 million signatures in 65 days to simultaneously qualify two initiatives in Michigan.
- Qualifying numerous candidates for the Michigan ballot in incredibly tight timeframes for offices from Congress to the presidency.

<u>Our Anti-Union work includes:</u>

- Passage of "Save Our Secret Ballot" anti-card check measures in 7 states, including winning at the ballot in 5 states with margins from 60% to 86%. These efforts are seen as the death knell to Big Labor's efforts nationally to pass card check. While others tried to temporarily kill the card check bill, we worked to kill the idea of tampering with secret ballot rights.
    - SEE THE TV SPOT ON THE 'THUMB-DRIVE" SENT WITH THESE MATERIALS.
- Winning Right-to-Work at the ballot in Oklahoma. This 2001 campaign was the last time right-to-work won at the ballot and the first time in a generation prior.

- Beating enough pro-Education Union legislators to allow Utah to become the first state to pass a full statewide school vouchers system.

- Keeping minimum wage off the ballot in Missouri in 2012 and defeating minimum wage at the ballot in 1996.

- Winning a legislative battle on "prevailing wage" in Oklahoma in 1995. A very targeted media/polling strategy aimed at the Speaker of the House, took Big Labor's #1 legislative priority in an overwhelmingly "D" controlled legislature and turned it into a wedge issue that, in the end, was never even was assigned to a committee.

<u>Michigan rules and challenges</u>:

As you know, Michigan requires gathering a total of 252,522 valid signatures of registered voters, equal to 8% of those that voted in the last gubernatorial election. There is no geographic distribution requirement, but individual petitions are county-specific and must be turned in by county.

Signatures must be gathered within 180 days. Circulators must be eligible to be registered voters in Michigan, but do not need to be Michigan residents.

<u>Recommendations:</u>

At a 70% validity rate, the minimum number of signatures necessary to garner the bare minimum of 252,522 would be 360,746. We strongly would recommend gathering a minimum of 375,000 – a cushion of 32.66%, and if possible a total of 400,000 signatures – a cushion of 36.87%.

Let us be clear, while we will guarantee a 70% validity, we believe the cost of legal fees and critical time will far outweigh the cost of gathering sufficient signature to better dissuade potentially protracted litigation.

We will gather the number of signatures requested, with an over/under margin of no more than 3%.

Previous clients in Michigan have separately contracted with local firm – JMS – to conduct validity independent from our work. It would be our recommendation to do that again here and to validate every signature. We cannot speak to the cost of that validity work and do not include it within our quoted prices.

<u>Rates and timeframes</u>:

Silver Bullet will complete the gathering of the necessary signatures to qualify the indirect statutory initiative with a guaranteed price of $2.82 per gross signature, with a guarantee of 70% validity or greater. Silver Bullet will also charge a one-time start-up fee of $25,000 in addition of the per signature price, in order to defray travel and logistical expenses.

This rate would hold if the start date is no later than March 1, 2015. After that, variables such as what is happening both in Michigan and nationally with other petitions may require a different rate.

Silver Bullet will endeavor to complete the effort by July 1, 2015.

The Campaign Committee would be responsible for printing of the petitions, with an expectation of needing three times the number of signature lines as is needed for actual signatures. (Yep, that's a lot of wasted paper and frankly we've tried for years to figure out how to use less without success that doesn't hinder signature-gathering production.)

**Some strategic thoughts:**

Because the statutory initiative is indirect in Michigan, referring it to the legislature for potential passage, and because ABC may seek legislative action separate from the petition, and because the Governor may currently be the impediment to legislative enactment, Silver Bullet would suggest the following tactics for the petition efforts:

- Target Governor Snyder's supporters. The Governor has 1,214 itemized contributors on his post-election campaign finance report. Silver Bullet could specifically target these individuals for signatures to the petition. If we were to gather the first, say 500 signatures from Snyder donors, this might have an impact on the Governor's position. While gathering these signatures, we could additionally gather signatures on a post card to the Governor, urging his active support of repealing prevailing wage. The same tactic can be used with any other group of individuals who may be in a place to influence the Governor – his neighbors, club members, family members, etc.

- Target specific legislative districts. We can over-emphasize key State House and/or State Senate districts for signature gathering. This will allow the ABC lobbyists to have specific counts on how many of their constituents have signed the petition to date. As with the governor, we can gather post cards directed at wayward or undecided legislators.

Silver Bullet has successfully used these and other tactics many times to garner the desired outcomes. Unlike other firms, our goal isn't just to gather the number of signatures called for in a contract. Our goal is to help win the campaign. We're happy to work directly with you on these and other ideas, and the costs associated with these efforts.

**Why Silver Bullet:**

The Silver Bullet motto is: *"Because sometimes you only get one shot!"*

We try to be very competitive on price, but we never seek to be the lowest bid for that sake alone. Unlike some, we never give a low-ball price to get a client in and hooked, with a later price increase waiting to be leveraged against the client. Unlike some, we present a price that we feel we can complete the job in a professional manner, on time and without panic.

As we tell clients all the time – *"Successful initiative petitions are very expensive...except compared to the unsuccessful ones. Those are a lot more costly."*

And because Silver Bullet is the only national petition firm with an unprecedented record of success at both qualifying and winning initiatives, we know we take more care and concern about how an initiative is qualified for the ballot, not just that the initiative qualifies for the ballot.

The bottom line: Silver Bullet doesn't do the most petitions. We're sometimes not the cheapest. But no firm in America has as extensive track record of placing and winning ballot measures. We're uber-competitive and we win.

We've done battle time and again against Big Labor in states across the country. We want to help ABC of Michigan win on prevailing wage, because we philosophically agree with the issue.

**Personal Service:**

We would be happy to come to Michigan to make an in-person presentation at your convenience. We would be thrilled to discuss the other campaign services we can provide – doing as much or as little of the overall campaign as you may desire.

Once we come to contract, a Silver Bullet partner will be intimately involved with the effort on a daily basis and will be in the state as needed...and then some.

Again, thank you for the opportunity to present this to you. We look forward to the next conversation and the opportunity to work together.

*Let's win!*

**SPECIFIC ANSWERS TO THE REQUEST FOR PROPOSAL QUESTIONS**

1. Silver Bullet has qualified dozens of initiative, referendum and recall petitions for the ballot throughout the country, as well as candidates for office at all levels – from State House to the White House. Unique to any other national petition management firm, Silver Bullet also manages ballot measure and candidate campaigns, winning 32 of 36 ballot measures, helping elect US Senators Mike Lee, Orrin Hatch, Jeff Flake and Lindsey Graham. Silver Bullet has been and will continue to be a client for the Republican National Committee for their grassroots work. Silver Bullet has likely done as much or more anti-union work than any other firm in the country.

2. Silver Bullet has been in business for more than a decade. Its partners include Chuck Warren, Tim Mooney and an associate partner Ben Key. The partners bring a cumulative 80+ years experience working in politics at all levels throughout the United States. Tim Mooney would be the lead partner working with ABC of Michigan on this project. Depending on the campaign season, Silver Bullet has between 5 and 12 employees and contracts with upwards of 800 independent contractors throughout the country. We would anticipate hiring upwards of 5 regional coordinators for the Michigan efforts and each would have 25 to 100 people contracting for signature gathering.

3. Mickey Blasfield, Ambassador Bridge Company – 586-467-0117
   Chris Faulkner, Gridiron Communications – 574-274-5522
   Matt Mason, Republican National Committee – 202-329-2176

4. Cost per signature: $2.82, plus a one-time startup fee of $25,000. Guarantee of 70% or greater validity rate. Initial deposit of $100,000 applied to the final signatures gathered. Billing weekly with payment needed by bank wire within 48 hours.

5. Start date of March 1, 2015 with anticipated completion date of July 1, 2015.

6. Petitions and up-to-date voter file to be provided by ABC/Michigan. Prompt weekly payments.

7. Uniquely, Silver Bullet screens all applicants to ensure each is qualified to be a registered voter. Each must sign a "code of conduct" specifically notifying the applicant of our "one-strike" policy and that we will seek prosecution against anyone we find breaking any law. And only Silver Bullet keeps a national "do not hire" list for those seeking employment with us or any vendor we work with.

8. Silver Bullet strongly suggests that ABC/Michigan separately contract with JMS to conduct 100% validation of all petitions collected, for outside assurance that the number of signatures necessary are present at the time of turn-in.

9. SEE #9

10. Silver Bullet will likely have 5 to 7 offices throughout Michigan where collection and processing of the signatures will take place.

11. Silver Bullet strongly suggests collecting between 375,000 and 400,000 signatures, not just to guarantee qualification, but also to dissuade against legal challenges to the signatures that will be costly and time consuming.

12. Silver Bullet is ready, willing and able to make an in-person presentation at the convenience of ABC/Michigan.